**NORTHERN ARAPAHO TRIBE, Plaintiff,**

v.

**Scott HARNSBERGER, Treasurer, Fremont County, Wyoming; Edmund Schmidt, Director, Wyoming Department of Revenue and Taxation; and Daniel Noble, Administrator, Excise Tax Division, Wyoming Department of Revenue and Taxation, In their individual and official capacities, Defendants**

v.

**City of Riverton, Wyoming, Intervenor**

v.

**United States of America and Eastern Shoshone Tribe, Third–Party Defendants.**

Case No. 08–CV–215–B.

United States District Court, D. Wyoming.

Oct. 6, 2009.

Andrew W. Baldwin, Berthenia S. Crocker, Janet E. Millard, Kelly A. Rudd, Baldwin Crocker & Rudd, Lander, WY, for Plaintiff.

Edward L. Newell, II, Jodi Ann Darrough, Fremont County & Prosecuting Attorney's Office, Lander, WY, Bruce A. Salzburg, David L. Delicath, Martin L. Hardsocg, Michael L. Hubbard, Wyoming Attorney General's Office, Cheyenne, WY, for Defendants.

Frank D. Neville, Scott P. Klosterman, Williams Porter Day & Neville, Casper, WY, for Intervenor. .

Amy Tryon, Patricia Miller, Department of Justice, Washington, DC, Donald R. Wharton, Native American Rights Fund, Boulder, CO, Kimberly D. Varilek, East-

ern Shoshone Tribe, Fort Washakie, WY, for Third–Party Defendants.

ORDER GRANTING EASTERN SHOSHONE TRIBE'S MOTION TO DISMISS (DOC. NO. 90); GRANTING UNITED STATES'S MOTION TO BE DISMISSED AS A THIRD–PARTY DEFENDANT (DOC. NO. 93); GRANTING STATE DEFENDANTS' SECOND MOTION TO DISMISS (DOC. NO. 96); AND GRANTING DEFENDANT HARNSBERGER'S RENEWAL OF MOTION TO DISMISS (DOC. NO. 100)

CLARENCE A. BRIMMER, District Judge.

This matter comes before the Court on several motions to dismiss: (1) a Rule 12(b)(1) motion to dismiss Eastern Shoshone Tribe ("EST") as a Third–Party Defendant (Doc. No. 90); (2) a motion to dismiss the United States as a Third–Party Defendant (Doc. No. 93);[1] and (3) two motions to dismiss the case, filed by Defendants Noble and Schmidt and Defendant Harnsberger ("State and County Defendants") (Doc. Nos. 96 & 100). Two hearings were held regarding these motions on April 16, 2009, and May 15, 2009, the second to address supplemental brief-ing. Appearing at the April 16 hearing were Kelly Rudd, Andrew W. Baldwin, Berthenia S. Crocker, and Janet E. Millard, on behalf of Plaintiff; Jodi Ann Darrough on behalf of Defendant Harnsberger; Martin Hardsocg and David Delicath on behalf of State Defendants; Frank Neville on behalf of Intervenor City of Riverton; Amy Tryon on behalf of the United States; and Kimberly Varilek and Donald Wharton on behalf of the EST. Appearances at the May 15 hearing were largely the same, except that Scott Klosterman appeared on behalf of Riverton and Patricia Miller appeared on behalf of the United States. This Court having carefully considered the motions, the materials on file, and the oral arguments, and being fully advised in the premises, **FINDS** and **ORDERS** the following:

## I. BACKGROUND

Plaintiff, the Northern Arapaho Tribe ("NAT"), brings this action seeking injunctive relief against alleged unlawful taxation by the State and County Defendants within the Wind River Indian Reservation ("Reservation").[2] The NAT rests its assertion of illegal taxation on the boundary descriptions resulting from the July 3, 1868 Treaty of Fort Bridger, 15 Stat. 655, the Lander Purchase Agreement of 1874,

---

1. The United States has not indicated which Rule 12 defense forms the basis for this motion. It is reasonable to conclude that the United States raises sovereign immunity as a defense to subject-matter jurisdiction under Rule 12(b)(1). *Normandy Apts., Ltd. v. U.S. Dept. of Housing and Urban Dev.*, 554 F.3d 1290, 1295 (10th Cir.2009) ("The defense of sovereign immunity is jurisdictional in nature, depriving courts of subject-matter jurisdiction where applicable."); *Neiberger v. Hawkins*, 150 F.Supp.2d 1118, 1120 (D.Colo.2001) ("A motion to dismiss based on sovereign immunity is treated as a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).").

2. Plaintiff in part seeks relief pursuant to 42 U.S.C. § 1983. Although not mentioned by any party, there is a question as to whether Plaintiff has standing to pursue a claim under this statute. *See Inyo County, Cal. v. Paiute-Shoshone Indians of the Bishop Community of the Bishop Colony*, 538 U.S. 701, 123 S.Ct. 1887, 155 L.Ed.2d 933 (2003) (holding that the plaintiff tribe was not a "person" who could sue under Section 1983 to vindicate sovereign rights, namely, a claimed immunity from the state court process); *Skokomish Indian Tribe v. United States*, 410 F.3d 506, 514–16 (9th Cir.2005) (en banc) (holding that tribe may not assert its treaty-based fishing rights under Section 1983).

18 Stat. 291, and the Thermopolis Purchase Agreement of 1897, 30 Stat. 93. (Doc. No. 1, Compl. 3.) The critical aspect of Plaintiff's allegations is its interpretation of a later surplus land act, the Act of March 3, 1905, ch. 1452, 33 Stat. 1016 ("1905 Act"). The 1905 Act served to codify, with amendments, an April 21, 1904 agreement ("1904 Agreement"), also referred to as the Second McLaughlin Agreement. Both tribes on the Reservation, the EST and Plaintiff, entered into this agreement with James McLaughlin, the United States Indian Inspector for the Reservation, acting on behalf of the United States. 1905 Act, 33 Stat. 1016, 1016. The Court does note, however, the Plaintiff takes the position in this case that it in fact never officially agreed to the 1904 Agreement. (Doc. No. 78, Mem. in Supp. of NAT Mot. for J. on Pleadings 17.)

Plaintiff contends that while the 1905 Act opened a portion of the Reservation ("1905 Act area") to non-Indian settlement, it did not terminate the reservation or Indian country status of that 1905 Act area. It is in this 1905 Act area where Plaintiff alleges State and County defendants are conducting illegal taxation of the Tribe and Indians. It appears that the question is of particular concern to the parties with respect to Riverton, as the city lies within the 1905 Act area but has historically existed as an incorporated state entity. Thus, while couched in the context of illegal state taxation, a grant or denial of relief to Plaintiff necessarily requires a determination as to whether or not the 1905 Act area diminished the Reservation.

After the hearing on State and County Defendants' original motions to dismiss, which were joined by Intervenor Riverton, this Court ordered that the United States and the EST be joined as Third–Party Defendants as they are required parties under Federal Rule of Civil Procedure 19(a).[3] (Doc. No. 60, Order Jan. 27, 2009.) Now joined and able to respond to their inclusion, the United States and the EST have filed motions to dismiss them as parties, invoking sovereign immunity and asserting lack of subject-matter jurisdiction. In addition, the original defendants again filed motions to dismiss this matter on the ground that it cannot proceed without the United States or the EST.

The resolution of these motions involves the application of principles of sovereign immunity as well as the application of Rule 19(b), which addresses when a case may proceed despite the absence of required parties who cannot be joined. The parties have taken different positions as to each of these issues. The United States has declared itself immune from suit and has not stated a position as to the continuing viability of this action. The EST also asserts immunity from suit, but also contends that this case must be dismissed in its absence. State and County Defendants agree that the United States and the EST are immune from suit and agree with the EST that the case must as a result be dismissed.[4] Plaintiff takes the position that the United States and the EST have waived immunity and thus, were appropriately made involuntary parties.[5] Plaintiff

---

**3.** The Complaint was not amended to reflect this joinder.

**4.** Although Riverton has not formally joined in the present motions to dismiss, the Court expects that it still aligns with the position of State and County Defendants.

**5.** Plaintiff has actually asserted two different positions as to whether sovereign immunity bars joinder of EST. It initially agreed that EST is immune from suit. (Doc. No. 106, Resp. to EST Mot. to Dismiss 2.) However, in later briefing, NAT asserts that, like the United States, the EST has waived sovereign immunity in light of the *Big Horn I* case dis-

alternatively argues that even if the United States and the EST are immune from suit here, this case may proceed without them as parties.

Given the present posture of the case, the Court will not revisit its earlier ruling that the United States and EST are required parties. If they are in fact immune from suit and cannot be joined, the Court must conduct a Rule 19(b) analysis to determine whether the case may proceed without them. As set forth below, the Court finds that the United States and the EST are indeed immune from suit in this matter and that this case may not proceed in their absence. However, before conducting the requisite analysis, it is helpful to address a case relied heavily upon by Plaintiff: *In re The General Adjudication of All Rights to Use Water in the Big Horn River System and All Other Sources,* 753 P.2d 76 (Wyo.1988) [hereinafter *"Big Horn I"*], aff'd sub nom. *Wyoming v. United States,* 492 U.S. 406, 109 S.Ct. 2994, 106 L.Ed.2d 342 (1989).

## II.  THE RELEVANCE OF *BIG HORN I* TO THIS MATTER.[6]

■ *Big Horn I* involved the adjudication of rights to use water in the Big Horn River System and all other sources within Wyoming's Water Division No. 3. *Id.* at 83.

*Big Horn I* specifically addressed Indian reserved water rights, one of three phases of the adjudication. *Id.* at 85. A portion of that opinion, which assessed congressional intent to reserve water for the Reservation, involved in part a review of the 1905 Act at issue here. In its review of the 1905 Act in this context, the court held that "[t]he Second McLaughlin Agreement, Treaty of April 21, 1904, Act of March 3, 1905, 33 Stat. 1016, does not evidence an intent not to reserve water." *Id.* at 92.

Central to Plaintiff's underlying claim is the assertion that the *Big Horn I* decision in fact decided the ultimate question here of whether the 1905 Act served to diminish the Reservation such that the ceded lands are no longer Indian country.[7] Plaintiff thus characterizes this case as seeking "enforcement of the judgment in *Big Horn I.*" (Doc. No. 115, NAT 19(a)(2) Br. 8.) Plaintiff maintains that the levy of taxes by State and County Defendants contravenes the ruling in *Big Horn I,* and that the ruling serves as *res judicata* here, precluding Defendants from arguing that the 1905 Act area is not Indian country. (Doc. No. 1, Compl. 4; Doc. No. 78, NAT Mot. for J. *passim;* Doc. No. 32, Resp. to Defs.' Mot. to Dismiss 4, 7, 17; Doc. No. 107, Resp. to U.S. Mot. to Dismiss 8.)[8]

cussed below. (Doc. No. 115, NAT 19(a)(2) Br. 8.)

**6.** In a review of a Rule 12(b) motion to dismiss, courts generally accept well-pleaded allegations as true, viewing them in the light most favorable to the plaintiff. *See infra.* Here, Plaintiff pleads that *Big Horn I* has a res judicata effect on this matter. (Doc. No. 32, Resp. to Defs.' Mot. to Dismiss 6–7.) However, an interpretation of the law set forth in *Big Horn I* and its legal effect is a legal conclusion, not a factual allegation, and the Court need not accept Plaintiff's interpretation of the case as true.

**7.** For clarification, references to diminishment and disestablishment in this Order both refer to termination of reservation status. Generally, diminishment occurs when only a portion of a reservation's lands lose reservation status, while disestablishment refers to the termination of an entire reservation. *See Yankton Sioux Tribe v. Gaffey,* 188 F.3d 1010, 1017 (8th Cir.1999) (making the distinction).

**8.** Plaintiff alternatively argues that even if this Court were to find *Big Horn I* inapplicable to the merits of this case, this issue has been previously addressed by the federal courts such that *stare decisis* bars re-litigation of the status of the 1905 Act area. (Doc. No. 78, NAT Mot. for J. 51.)

Based on its position that *Big Horn I* has preclusive effect regarding the diminishment issue, Plaintiff contends that the EST and the United States are appropriately made parties in this action as they were parties in *Big Horn I*. Plaintiff argues that the result in *Big Horn I* triggers the United States' fiduciary trust obligation to protect it from unlawful encroachment and that the United States has thus waived sovereign immunity in this suit seeking declaratory and injunctive relief.[9] (Doc. No. 107, Resp. to U.S. Mot. to Dismiss 7.) Similarly, Plaintiff contends that the EST has waived sovereign immunity as it was a party, by intervention, in *Big Horn I* and is bound by that judgment. (Doc. No. 115, NAT 19(a)(2) Br. 8.)

Plaintiff's reliance on *Big Horn I* rests upon the interpretation that *Big Horn I* held the 1905 Act area to be part of the Reservation, and thus, Indian country. If Plaintiff's reliance is misplaced, *Big Horn I* will have no impact on the question of proper parties here.

The Court disagrees with Plaintiff's interpretation of *Big Horn I*. The Wyoming Supreme Court's review of the 1905 Act in *Big Horn I* was limited to the narrow context of reserved water rights, and the court did not explicitly base its finding on a determination that the 1905 Act area was Indian country. In fact, the Wyoming Supreme Court has since stated that, in *Big Horn I*, "while they disagreed over whether reserved water rights continued to exist in the ceded lands, the majority and dissent ... agreed that the reservation had been diminished." *Yellowbear v. Wyoming*, 174 P.3d 1270, 1283 (Wyo.2008) (citing *Big Horn I*, 753 P.2d at 84, 112, 114, 119–35). This Court is in no position to second-guess the Wyoming Supreme Court's interpretation of its own words.[10]

Setting aside the necessary deference to a court's interpretation of its own opinions, this Court finds unpersuasive Plaintiff's insistence that the *Big Horn I* court implicitly held that the 1905 Act area remains part of the Reservation. (Doc. No. 78, NAT Mot. for J. 29 ("the determination [regarding disestablishment] was a prerequisite to the award of federal water rights within that portion of the federal reservation").) First, the majority's opinion does not explicitly or implicitly address the 1905 Act beyond the congressional intent regarding reservation of water rights. *See, e.g., Big Horn I*, 753 P.2d at 91–92. Second, according to the dissent, in reviewing the quantification analysis of the reserved water rights, the majority "ignored" the significance of the diminishment of the Reservation when it included the 1905 Act area in the area to be quantified. *Id.* at 119–20 (Thomas, J. dissenting). Whether the issue of diminishment

9. Plaintiff also argues that several other statutes give rise to this trust obligation in this instance. (*See* Doc. No. 107, Resp. to U.S. Mot. to Dismiss 8–11.)

10. Plaintiff attempts to call into question the integrity of the *Yellowbear* decision by noting that two of the *Yellowbear* justices represented private water users in the relevant "boundaries and dates" portion of the Big Horn adjudication, and that one of those justices also argued for diminishment in an EPA matter while he was Wyoming Attorney General. (Doc. No. 78, NAT Mot. for J. 59 n. 100.) This Court will not question the judicial integrity of the Wyoming Supreme Court. Plaintiff also represents that the *Yellowbear* court agreed with the dissent in *Big Horn I*, effectively altering the *Big Horn I* judgment in violation of the principle of finality. This misconstrues *Yellowbear*. The *Yellowbear* court's reference simply notes that the "events and circumstances pertaining to the 1905 Act were set forth and examined in great detail" in the dissenting opinion, and goes not to note that the majority and the dissent in *Big Horn I* agreed on diminishment. *Yellowbear*, 174 P.3d at 1283.

was ignored or otherwise determined not related to the issue, it was not clearly a part of the majority opinion's analysis and the court notably did not overrule prior decisions finding diminishment of the Reservation.[11] Third, language used in the opinion supports the conclusion that the court operated under the belief that the 1905 Act effected diminishment. For example, in recounting the history of the Reservation, the Court discusses the Reservation post–1905 in terms that demonstrate a belief that the area ceded by the 1905 Act was no longer part of the Reservation. *Big Horn I,* 753 P.2d at 84. Fourth, while Plaintiff asserts that the Special Master's Report demonstrates that a finding of no diminishment is necessary to the results in the case (Doc. No. 78, NAT Mot. for J. 40–42), the precedential value of his opinions is questionable, especially where the *Big Horn I* court provided its own reasoning as to whether an 1868 priority date still existed, *Cf.* Margaret G. Farrell, *The Function and Legitimacy of Special Masters: Administrative Agencies for the Courts,* 2–FALL Widener L. Symp. J. 235, 284 (1997) (When compared with decisions of judges, "[t]he decisions made by masters ... have little precedential value. Thus, the recommended findings of masters, accepted because they are not demonstrated to be clearly erroneous, are not cited by courts or other masters. Only the decision of the district court, if any, accepting the mas-

ter's report, is available as an element of public law. ... [W]here there are disputed issues of law or recommended facts in such cases that are challenged as clearly erroneous, it is the district court's decision and its appellate review that is determinative and precedential in future cases").

■ Finally, that the United States Supreme Court may have denied certiorari on the question of disestablishment has no bearing on the merits of the question. *Wyoming v. United States,* 488 U.S. 1040, 109 S.Ct. 863, 102 L.Ed.2d 987 (1989) (granting certiorari in part as to a separate question and denying certiorari on the question, "What priority date should be accorded a reserved water right, if any, for practicably irrigable lands which were ceded by the Reservation's Tribes, if those lands later were restored to and made a part of the reservation by the United States or were reacquired by Indians from non-Indians?" Pet. for Writ of Cert., *Wyoming v. United States,* No. 88–309, 1988 WL 1094117 (filed Aug. 18, 1988)). Such a denial of certiorari is not governing precedent as to the merits of the question denied. *Robinson v. Ignacio,* 360 F.3d 1044, 1057 n. 6 (9th Cir.2004) (citing *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (quoting *United States v. Carver,* 260 U.S. 482, 490, 43 S.Ct. 181, 67 L.Ed. 361 (1923), for the statement that "denial of a writ of certiorari imports no expression of opinion upon the merits of the case")).

---

**11.** While the *Big Horn I* court overruled *Merrill v. Bishop,* 74 Wyo. 298, 287 P.2d 620 (1955), it did so only to the extent that *Merrill* indicated that the admission of Wyoming to the Union abrogated reserved water rights for the Reservation. *Id.* at 113. It thus overruled *Merrill* on a limited issue relating to the admission of Wyoming to the United States and not with respect to any issue relating to the 1905 Act. This leaves intact the court's statements in *Merrill* which demonstrate the court's view that the 1905 Act diminished the

Reservation: "The lands involved in this action became a part of the public domain when Congress on March 3, 1905, approved the treaty of 1904. Furthermore, there is no evidence in the case that any of the Indian allotments here in question were granted prior to that time. So it is not necessary to consider what the law would be if these allotments had been granted while the lands herein involved were still contained in an Indian Reservation." *Merrill,* 287 P.2d at 625.

As *Big Horn I* does not rule on the underlying question presented here, the Court finds the case to have no preclusive effect on the United States or the EST such that it would influence the question of joinder.[12]

## III. IMMUNITY FROM SUIT

### A. Rule 12(b)(1)

Both the EST and the United States assert that this Court lacks subject-matter jurisdiction over them due to sovereign immunity. Lack of subject matter jurisdiction due to sovereign immunity may be raised by a Rule 12(b)(1) motion to dismiss. *See E.F.W. v. St. Stephen's Indian High Sch.*, 264 F.3d 1297, 1302–03 (10th Cir.2001) (tribal sovereign immunity); *Holt v. United States*, 46 F.3d 1000 (10th Cir.1995) (federal sovereign immunity). The party asserting jurisdiction bears the burden of establishing the existence of subject-matter jurisdiction. *Id.*

Review of a Rule 12(b)(1) motion to dismiss requires review of the non-conclusory factual allegations in the complaint. *Penteco Corp. Ltd. P'ship–1985A v. Union Gas Sys., Inc.*, 929 F.2d 1519, 1521 (10th Cir. 1991). Here, the EST and the United States assert immunity assuming the truth of the facts as pleaded and thus, the allegations in the complaint are accepted as true for the purposes of this review. *See Holt*, 46 F.3d at 1002.

### B. Eastern Shoshone Tribe

■ As a federally recognized Indian tribe and sovereign entity, the EST enjoys sovereign immunity from suit absent an unequivocally expressed waiver of immunity by the tribe, or abrogation of immunity by Congress. *Fletcher v. United States*, 116 F.3d 1315, 1324 (10th Cir.1997). The EST asserts that it has not waived these rights and that Congress has not abrogated immunity. The EST also asserts that its sovereign immunity is not abrogated by the fact that it and Plaintiff have undivided one-half interests in reservation resources and joint authority over territorial matters.

In response to the EST's Motion to Dismiss, the NAT initially did not contest the EST's immunity from suit: "The NAT concurs with the EST that it is a federally recognized Indian tribe and a sovereign governmental entity. As such, it cannot be compelled to participate in litigation without an express waiver by the EST or an Act of Congress. As a result, the NAT does not oppose dismissal of the EST from this action." (Doc. No. 106, Resp. to EST Mot. to Dismiss 2.) The Court likewise finds that EST's assertion of sovereign immunity compels dismissal of EST as a party.

In a later brief, the NAT alters its position and contends that since the EST waived its immunity from suit in *Big Horn I* and since "the case at bar is concerned with the *res judicata* effect of the *Big Horn I* case, the Court may conclude that the EST's specific waiver of sovereign immunity in *Big Horn I* carries through and is imputed to these proceedings as a matter of law." (Doc. No. 115, NAT 19(a)(2) Br. 8.) Plaintiff provides no supporting authority for this proposition. Moreover, as the Court has explained above, *Big Horn I* carries no preclusive effect in this matter. Accordingly, the Court is unpersuaded by this argument.

---

**12.** The Court acknowledges that this holding effectively disposes of Plaintiff's stayed Motion for Judgment on the Pleadings insofar as Plaintiff argues for judgment on the basis that

*Big Horn I* prevents State and County Defendants from re-litigating the issue of disestablishment.

## C. United States

■ The question of immunity and waiver with respect to the United States is more vigorously debated. "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (footnote omitted). Consent to suit exists only upon explicit, unequivocal waiver of sovereign immunity by Congress. *Block v. North Dakota ex rel. Bd. of Univ. and Sch. Lands,* 461 U.S. 273, 288, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983); *United States v. Murdock Mach. & Eng'g Co. of Utah,* 81 F.3d 922, 929 (10th Cir.1996). Consent cannot be supplied by legislative history, by implication, or by actions of officers of the United States. *Id.* at 930–31. In addition, policy concerns and perceived inequities stemming from the facts of a particular case cannot serve to effect a waiver of immunity. *See Native Am. Distrib. v. Seneca–Cayuga Tobacco Co.,* 546 F.3d 1288, 1295 (10th Cir.2008) (addressing this principle in the context of tribal sovereignty) (citing *Ute Distrib. Corp. v. Ute Indian Tribe,* 149 F.3d 1260, 1267 (10th Cir.1998), and *Pan Am. Co. v. Sycuan Band of Mission Indians,* 884 F.2d 416, 419 (9th Cir.1989) (noting that Indian sovereignty is like that of other sovereigns in this respect)). Absent the requisite consent, this Court lacks jurisdiction to either "restrain the government from acting, or to compel it to act." *Murdock Mach.,* 81 F.3d. at 930 (quoting *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 704, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949)).

This immunity from suit is interpreted more broadly than to mean just immunity from suit *against* the United States. *Id.* at 931. The federal government "is not subject to 'legal proceedings, at law or in equity' or 'judicial process' without its consent." *Id.* (quoting *Belknap v. Schild,* 161 U.S. 10, 16, 16 S.Ct. 443, 40 L.Ed. 599 (1896)). Regardless of the appropriate alignment of the United States as a plaintiff or defendant in this matter, the immunity analysis does not change.

■ The United States argues that there has been no waiver of immunity such that it may be made a party to this suit. It argues that the existence of the government's general trust responsibility towards federally recognized Indian tribes does not waive federal sovereign immunity. Rather, it contends that an explicit statutory waiver of immunity must exist, such as in the Indian Tucker Act, 28 U.S.C. § 1505. Thus, the United States argues, a tribe cannot survive the defense of sovereign immunity where the tribe alleges a breach of common law trust responsibility rather than a statutory trust responsibility. The United States further argues that the general trust responsibility that exists does not force it to participate in litigation alongside a tribe absent a specific law or restriction that creates an obligation to do so. In essence, the United States invokes the Attorney General's discretionary authority over the United States' participation in litigation.

Plaintiff takes great exception to the position of the United States. It acknowledges that the general trust obligation of the United States to federally recognized tribes does not by itself waive immunity or obligate the United States to participate in every case to which a tribe is a party. However, Plaintiff contends that because this case seeks only injunctive relief and not money damages, the United States has waived immunity from suit under 5 U.S.C. § 702 of the Administrative Procedure Act ("APA"). The NAT asserts that in this context of a claim for injunctive relief, the United States' trust obligation serves to overcome the defense of immunity.

The Court finds that, contrary to Plaintiff's assertion, Section 702 does not effect a waiver of immunity in this case. Although Plaintiff seeks injunctive relief, it is not seeking injunctive relief against the United States. As the Supreme Court has said, "Jurisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity, together with a claim falling *within the terms* of the waiver." *United States v. White Mountain Apache Tribe,* 537 U.S. 465, 472, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003) (citation omitted) (emphasis added). Section 702 of the APA provides:

> A person *suffering legal wrong because of agency action,* or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and *stating a claim that an agency or an officer or employee thereof acted or failed to act* in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that *it is against the United States or that the United States is an indispensable party.* The United States may be named as a defendant in any such action, and a *judgment or decree may be entered against the United States:* Provided, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702. Section 702 clearly effects a waiver. However, the claims brought here do not fall within the terms of that waiver. To fall within the terms, the action must seek non-monetary relief *and* claim that an agency or an officer improperly acted or failed to act. Thus, Section 702 contemplates suit in which a judgment or decree against the United States is sought for wrongful action or inaction by the United States or an officer. Here, the Complaint does not allege a legal wrong committed by the United States. Rather, the allegations focus on alleged wrongs committed by state and county actors.

Plaintiff is correct that courts have consistently held that the APA waives immunity to claims for injunctive relief whether they are brought under the purview of the APA or not. *See, e.g., Pullman Constr. Indus., Inc. v. United States,* 23 F.3d 1166, 1169 (7th Cir.1994) ("Congress has consented to litigation in federal courts seeking equitable relief from the United States"); *Cobell v. Babbitt,* 30 F.Supp.2d 24, 32 (D.C.Cir.1998) ("The § 702 waiver of sovereign immunity in actions seeking relief other than money damages against the government also applies to claims brought outside the purview of the APA, such as some of the claims involved in the case at bar," including a breach of trust duties); *Chamber of Commerce v. Reich,* 74 F.3d 1322, 1329 (D.C.Cir.1996) ("The APA's waiver of sovereign immunity applies to any suit whether under the APA or not"). *See also* Richard H. Fallon, Jr. et al., *Hart and Wechsler's The Federal Courts and the Federal System* 1036–37 (5th ed.2003) ("the statute waived sovereign immunity in federal court suits seeking relief other than money damages against federal agencies or officials ... and allowed the United States to be named as a defendant and to have judgment entered against it"). This

is supported by the fact that, "[t]he Judiciary Committees of both Houses, in their reports on the 1976 amendment [to the APA], identified as the measure's clear purpose 'elimina(tion of) the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an official capacity.'" *Sea–Land Svc., Inc. v. Alaska R.R.,* 659 F.2d 243 (D.C.Cir.1981).

However, the common denominator in each of these cases is that a claim was asserted *against* the United States for actions of an agency, as defined by 5 U.S.C. § 701(b)(1). Since the Complaint contains no allegations of wrongful action or inaction by an agency of the United States, Section 702 cannot serve to waive immunity here. While Plaintiff asserts that the United States' refusal to participate here may give rise to a cognizable claim for breach of trust in the future, that is not this case.

Plaintiff argues that claims against the United States are not a jurisdictional prerequisite. (Doc. No. 107, Resp. to U.S. Mot. to Dismiss 11.) Plaintiff makes this argument in response to an argument allegedly made by the United States. Plaintiff asserts that the United States took the position that this Court has no jurisdiction absent a claim for *money damages* against the United States. The Court does not read the United States' argument so broadly. The relevant discussion simply argued lack of jurisdiction absent waiver of immunity. In that discussion, the United States provided as an example the Indian Tucker Act, which does permit money damages in certain instances. (Doc. No. 94, U.S. Mot. to Dismiss 3–4.) Nevertheless, the Court finds that the cases cited by Plaintiff in support of its position are unhelpful to the question of joinder of the United States in this matter. In *Heusle v. Nat'l Mut. Ins. Co.,*

628 F.2d 833 (3d Cir.1980), the topic was not at issue on appeal. The United States was simply "described in the complaint as defendant or involuntary plaintiff," and the opinion does not reveal whether the United States contested being named as a party. 628 F.2d at 835. In *Illinois v. Brighton Bldg. & Maint. Co.,* No. 77 C 4541, 1978 WL 1522, at *7 (N.D.Ill. Nov. 8, 1978), an unpublished decision, the court does not directly address sovereign immunity, instead concluding without explanation that the United States was subject to the Court's jurisdiction and moving on to find joinder appropriate under Rule 19.

The NAT also attempts to distinguish as inapposite many of the cases cited by the United States by pointing out that several involve claims for money damages against the United States and others are irrelevant based on their underlying facts. (Doc. No. 107, Resp. to U.S. Mot. to Dismiss 5.) However, those cases Plaintiff attempts to discount were not cited for their specific facts, such as whether money damages were sought. Rather, they were cited by the United States for the law surrounding immunity, beginning with the foundational rule that sovereign immunity bars suit absent a clear waiver. (Doc. No. 94, U.S. Mot. to Dismiss 2–5.) It just so happens that several of the cases cited involved the Indian Tucker Act and claims for money damages.

■ Aside from Section 702, Plaintiff has provided no other authority unambiguously mandating the participation of the United States in this case. "[C]ourts have long acknowledged that the Attorney General's authority to control the course of the federal government's litigation is presumptively immune from judicial review" in both criminal and civil matters. *Shoshone–Bannock Tribes v. Reno,* 56 F.3d 1476, 1480 (D.C.Cir.1995).

However, this discretion is limited in that it may be circumscribed by statute. *Id.* at 1481. More to the point, "an Indian tribe cannot force the government to take a specific action unless a treaty, statute or agreement imposes, expressly or by implication, that duty. 'Without an unambiguous provision by Congress that clearly outlines a federal trust responsibility, courts must appreciate that whatever fiduciary obligation otherwise exists, it is a limited one only.'" *Id.* at 1482 (quoting *N. Slope Borough v. Andrus*, 642 F.2d 589, 612 (D.C.Cir.1980)) (finding that statute imposed "only a discretionary duty of representation" and did not "withdraw discretion from the Attorney General, … offer[ing] no standards for judicial evaluation of the Attorney General's litigating decisions to pursue or not to pursue particular claims"). Even where a duty to represent tribal interests is explicitly established, as was the case in *Shoshone–Bannock*, absent an explicit delineation of the scope of that duty, "[c]ourts are ill-equipped to evaluate the factors that go into a decision not to bring suit or to enforce regulations." *Id.* at 1481 (citing *Heckler v. Chaney*, 470 U.S. 821, 832, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985)).

■ Plaintiff suggests several statutes and treaties as sources for a trust responsibility requiring the United States' participation in this case.[13][14] (Doc. No. 107, Resp. to U.S. Mot. to Dismiss 7–10.) None of these sources, assuming they create a trust responsibility, unambiguously circumscribes the discretion afforded the United States in pursuing the present

case. The language of the 1905 Act cited by Plaintiff states that "the United States shall act as trustee for said Indians to dispose of such lands and to expend for said Indians and pay over to them the proceeds received from the sale thereof only as received, as herein provided." 1905 Act, art. IX. On its face, the provision creates a trust relationship with respect to disposal of the lands and use of the sale proceeds. No express or implied duty to pursue claims exists and no terms exist with which the Court may discern a limitation on government discretion to pursue a relevant claim.

Plaintiff's reference to the Indian Major Crimes Act, 18 U.S.C. § 1153 is even less availing. Plaintiff contends that since the Act flows from the trust responsibility to promulgate the statute and since the United States' exclusive jurisdiction under this statute is at stake here, the Act is a basis upon which to conclude that the United States must participate here. Again, however, Plaintiff points to no clear circumscription of the discretion afforded to the United States in choosing which claims to pursue. Plaintiff's reference to the Indian Land Consolidation Act, 25 U.S.C. §§ 2201–21, is similarly unhelpful. Plaintiff simply relies on the policies behind that statute in support of the existence of a requirement that the United States litigate here. This broad argument is insufficient to demonstrate an obligation to litigate. Finally, Plaintiff references the Indian Tribal Justice Act, 25 U.S.C. §§ 3601–02, 3611–14, 3621, 3631, and the Indian Tribal Justice Technical and Legal Assistance Act of 2000, 25 U.S.C. §§ 3651–53, 3661–66,

---

13. It is unclear whether Plaintiff suggests these sources in the context of Section 702, or whether they are intended as independent waivers of sovereign immunity requiring joinder. As the Court finds Section 702 inapplicable, these sources are assessed in the latter context.

14. Plaintiff also cites to *Big Horn I* as implicating the United States' trust responsibility such that it is required to participate in this case. However, as explained previously, *Big Horn I* does not implicate the question of joinder in this matter.

3681, for the policy of supporting tribal courts, which flows from the trust responsibility. Plaintiff fails to explain how these acts limit the United States' discretion to not pursue this case.

Because there is no waiver of sovereign immunity through Section 702 or the other proffered sources of waiver, the decision to participate in this suit is a decision that cannot be made for the United States by this Court. Even with the existence of a general trust responsibility to act on behalf of Plaintiff, and with the purported injustice the failure to participate works upon the tribe, the Court cannot compel the United States to participate here. There has been no waiver of sovereign immunity and no unambiguous overture by Congress that limits the discretion of the United States in choosing not to participate in this action.[15] A perceived inequity is not enough. Therefore, the United States must be dismissed as a party.

### D. Effect of Immunity on Rule 19(a)(2) Involuntary Joinder

■ The parties conducted additional briefing on whether the Court has the authority to require the joinder of the EST and the United States pursuant to Rule 19(a)(2), which permits a Court to order the joinder of a party who refuses to join as a plaintiff. It is this Rule which permitted the Court in the first instance to join the EST and the United States. However, the logical prerequisite to the operation of this rule is that a party may be joined at all. *See* 4 James Wm. Moore et al., *Moore's Federal Practice* § 19.02[3][b] (3d ed.2009) (explaining that if joinder is feasible, a court may invoke Rule 19(a)(2), but if joinder is not feasible, such as when it destroys subject-matter jurisdiction, the court must proceed directly to the question of indispensability). Since the Court has now determined that neither the EST nor the United States may be joined, the Court cannot invoke Rule 19(a)(2) to keep them as involuntary parties. Rather, the Court must consider the propriety of allowing the case to proceed without them.

### IV. WHETHER THE CASE MAY PROCEED OR MUST BE DISMISSED

State and County Defendants have moved for a second time to dismiss this case pursuant to Rule 12(b)(7) for failure to join a party. They contend that, per Rule 19(b), the case cannot proceed without the EST or the United States.

Helpful to the Rule 19(b) analysis is a review of the basis for the relief that Plaintiff seeks. Plaintiff alleges illegal taxation on the basis that the 1905 Act did not diminish the Reservation and the 1905 Act area remains part of the Reservation. While couched in the context of illegal taxation, this case requires review of the Act and its effect on the 1905 Act area.

The 10th Circuit has explained the nature of similar factual allegations. *See Osage Nation v. Oklahoma ex rel. Oklahoma Tax Comm'n*, 260 Fed.Appx. 13, 18–19 (10th Cir.2007). Although making its observations in the context of answering whether a state's Eleventh Amendment immunity barred suit against the state, the observations are equally compelling here:

---

**15.** Plaintiff notes that the United States has intervened in another pending case involving the question of diminishment, *Saginaw Chippewa Indian Tribe of Michigan v. Granholm*, No. 05–10296–BC (filed Nov. 21, 2005). Indeed, the same Department of Justice attorney represents the United States in that case as represents the United States here. The Court will not speculate as to the rationale behind the choice to pursue or not pursue these cases, respectively. This is precisely the discretionary decision-making that must be left to the Attorney General.

[T]he real issue in this case ... is not whether the State's income tax is proper. While the Nation claims to be seeking only injunctive relief from state taxation, the essence of this case is whether the Nation or the State of Oklahoma is the supreme sovereign with respect to Osage County or whether some form of dual sovereignty may apply. The Nation contends all of the land within Osage County is part of the Osage Indian Reservation and thus, Indian country. If the Nation is correct, the State cannot collect income tax from any tribal members employed by the Tribe living in Osage County. The State contends the non-trust land in Osage County is not Indian country and instead is under the jurisdiction of the State. If the State is correct, the income tax is proper. *Whether the non-trust portions of Osage County are Indian country is a question of jurisdiction, not of tax, and the relief the Nation seeks is to divest Oklahoma of sovereign rights, not simply to enjoin a tax.*

*Id.* (emphasis added). The *Osage* court added a further footnote:

A ruling in favor of the Nation on the merits could affect more than the State's ability to collect income tax. The Nation might be able to foreclose Oklahoma from exercising sovereignty over Osage County in myriad other ways.

*Id.* at 19 n. 9. In turn, where the state would be deprived of jurisdiction, the federal government's jurisdiction and obligations with respect to the disputed area would also be implicated.

As explained in *Osage*, a judgment in favor of Plaintiff would have far reaching effects beyond the question of state taxation. Moreover, it is an all-or-nothing proposition. Either the 1905 Act area is a part of the Reservation, or it is not. A finding that it remains part of the Reservation would upend the state and local authorities' longstanding assertion of jurisdiction over the area, including the City of Riverton—an assertion of jurisdiction which has not been actively contested by the United States.[16]

Turning to the question of dismissal, if, in equity and good conscience, this case cannot proceed without the EST, the United States, or both, the case must be dismissed. Fed.R.Civ.P. 19(b). The burden of demonstrating this lies with the moving party. *Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr.*, 94 F.3d 1407, 1411 (10th Cir.1996). Rule 19(b) guides the analysis:

If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:

(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2) the extent to which any prejudice could be lessened or avoided by:

(A) protective provisions in the judgment;

(B) shaping the relief; or

---

**16.** The Court recently had occasion to review a habeas petition by an Indian claiming that his alleged crime occurred in Indian country and not within the State's jurisdiction. *See Yellowbear v. Hornecker*, 636 F.Supp.2d 1254 (D.Wyo.2009). Petitioner there made the same argument as the NAT here that the 1905 Act did not diminish the Reservation and re- move the Indian country status of the lands opened to settlement. In that case, it was noted by the State, in support of diminishment, that the United States made no attempt to exercise jurisdiction in Yellowbear's criminal case. Summ. J. Hr'g Tr. 37:17–37:21, May 14, 2009, *Yellowbear*.

(C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed.R.Civ.P. 19(b).

The analysis is not a formulaic one. Rather, "[t]he inquiry is a practical, fact-specific one, designed to avoid the harsh results of rigid application." *Dawavendewa v. Salt R. Project Agricultural Improvement and Power Dist.,* 276 F.3d 1150, 1155 (9th Cir.2002). "The decision whether to dismiss ... must be based on factors varying with the different cases, some such factors being substantive, some procedural, some compelling by themselves, and some subject to balancing against opposing interests." *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 118–19, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968). Thus, the list of factors in Rule 19(b) does not create a rigid test comprised of exclusive factors. *Republic of Philippines v. Pimentel,* 553 U.S. 851, 128 S.Ct. 2180, 2188, 171 L.Ed.2d 131 (2008); *Davis ex rel Davis v. United States,* 343 F.3d 1282 (10th Cir.2003). A court must assess and balance the unique combination of concerns in a particular case. *See Pimentel,* 128 S.Ct. at 2188.

Central to the Rule 19(b) analysis here is the fact that both of the necessary parties cannot be joined due to their sovereign immunity. Sovereign immunity is a compelling factor that weighs strongly in favor of dismissal. *Davis v. United States,* 192 F.3d 951, 960 (10th Cir.1999) (holding that there is a strong policy favoring dismissal for nonjoinder due to tribal sovereign immunity, but that Rule 19(b) factors must still be considered) (citing dicta in *Enter. Mgmt. Consultants, Inc. v. United States ex rel. Hodel,* 883 F.2d 890, 894 (10th Cir.1989) ("When, as here, a necessary party under Rule 19(a) is immune from suit, there is very little room for balancing of other factors set out in Rule 19(b), because immunity may be viewed as one of those interests compelling by themselves." (internal quotations omitted))). Although not a compelling factor by itself, that the EST and the United States are absent due to sovereign immunity is a significant consideration. Thus, the discretion otherwise afforded this Court in balancing the equities under Rule 19(b) is to a great degree circumscribed, and the scale is already heavily tipped in favor of dismissal. *Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt,* 43 F.3d 1491, 1497 (D.C.Cir.1995).

Upon review, the Court finds that, in equity and good conscience, this case must be dismissed due to the absence of the EST and the United States.

**A. 19(b)(1): Prejudice to the EST, the United States, or existing parties if a judgment is rendered**

The question of prejudice must be determined with sufficient consideration given to an absent party's sovereign status. *See Pimentel,* 128 S.Ct. at 2189–92. Attendance to the merits of Plaintiff's claims necessarily affects nonfrivolous claims belonging to the EST and the United States. As the *Pimentel* Court recently stated, "where sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign." *Id.* at 2191. Certainly, the EST has a claim with respect to the effect of the 1905 Act, just as the NAT does. It has an equal interest in the Reservation and was a party to the agreement central to this case. Similarly, the United States has interests affected by a determination

on the merits. While the United States has not provided argument on this point, it too was a party to the 1904 Agreement, and its jurisdictional interests and obligations are directly implicated.

The fact that a sovereign entity could have intervened, but chose not to, cannot be considered as a mitigating factor to weigh against this likelihood of prejudice. *See Wichita and Affiliated Tribes of Oklahoma v. Hodel,* 788 F.2d 765, 775 (D.C.Cir.1986) (declined to hold that "the de facto opportunity to file position papers with the court on a cross-claim is sufficient to mitigate the prejudice of non-joinder"); *Makah Indian Tribe v. Verity,* 910 F.2d 555, 560 (9th Cir.) (holding that if intervention requires waiver of immunity, the ability to intervene does not lessen prejudice). To do so would invade the province of the sovereign and penalize it for making decisions it has the sovereign right to make. The Court cannot inject its or another party's subjective view on the propriety of that decision. Moreover, to argue that a sovereign can intervene to protect its interests "would render Rule 19(b) almost completely nugatory." *Navajo Tribe of Indians v. State of New Mexico,* 809 F.2d 1455, 1472 n. 25 (10th Cir.1987) (noting that a required party that is not joined would always satisfy the requirements for intervention as of right; to say that the availability of intervention mitigates prejudice would mean that a court could never find a required party to be indispensable).

The NAT also contends that the EST would be adequately represented by the United States were the United States made a party. The Court disagrees. It is true that prejudice to an absent party may be minimized if it is adequately represented in the suit. *Rishell,* 94 F.3d at 1411. In other words, if the absent party shares "virtually identical" interests with a party, prejudice to the absent party is greatly reduced. *Sac and Fox Nation of Missouri v. Norton,* 240 F.3d 1250, 1259 (10th Cir.2001). Here, if the United States were a party to this action, it would be acting as trustee for both the EST and for Plaintiff. However, it is unlikely that this would result in adequate representation of the EST, for two reasons. First, the EST and Plaintiff do not necessarily approach this legal matter on the same footing. Plaintiff itself suggests that in order to address the diminishment question, "the Court would be required to make a separate inquiry and separate determination regarding the intent and understanding of each Tribe." (Doc. No. 32, Resp. to Defs.' Mot. to Dismiss 15 (asserting that the EST is not necessary by arguing that issues arising from the 1904 Agreement do not necessarily implicate the rights of the EST).) Plaintiff has unequivocally argued that it in fact did not approve the 1904 Agreement, challenging the underlying validity of the agreement that formed the basis of the 1905 Act, whereas the EST does not challenge the validity of the 1904 Agreement. (*See* Doc. No. 118, EST Resp. to NAT 19(a)(2) Br. 10.) The tribes do not represent the same interests and the United States cannot adequately, simultaneously represent both of them. *Makah Indian Tribe v. Verity,* 910 F.2d 555, 560 (9th Cir.1990) (finding "the absent tribes had no proper representative because potential intertribal conflicts meant the United States could not represent all of them"). Second, it is not a certainty that the United States represents interests virtually identical to that of the EST with respect to the diminishment question. The alleged alignment of interests between the United States and the EST is far from the identity of interests found in *Sac and Fox,* where the Secretary of Interior had taken land into trust at the request of the tribe pursuant to a non-discretionary duty and the

actions challenged in the suit were those of the Secretary. *See Sac and Fox,* 240 F.3d at 1259–60.

■ As to the present parties, a determination of no diminishment in the absence of the EST, the United States, or both, would significantly prejudice the State and County Defendants. As has been consistently argued, the EST and the United States are not bound by a judgment here in their absence and there is a strong likelihood that the State and local entities would face inconsistent obligations, as another court or adjudicative body could render a decision opposite to that of this Court. Without the EST or the United States at the table here, a determination against the State and County would exacerbate rather than resolve jurisdictional uncertainty.

### B. 19(b)(2): Extent to which prejudice by a judgment could be lessened or avoided

■ Prejudice cannot be mitigated here. The determination that Plaintiff asks the Court to make cannot be shaped or revised in any way to take into consideration the absence of the EST or the United States. To decide the merits, this Court must make a boundary determination based on interpretation of the 1905 Act, a proposition that is not subject to partial resolution. Whatever the Court decides will necessarily affect the interests of the EST and the United States and will not lessen the prejudice worked upon them or present parties by their absence, despite the fact that neither would be bound by the Court's judgment.

In suggesting that prejudice can in fact be lessened, Plaintiff simply states, "The Court can eliminate any risk of confusion quite simply by: (a) observing the independent sovereign status of each Tribe; (b) distinguishing the sovereign immunity of Tribes to be free of State taxation within their boundaries from issues arising from ownership of real property; and (c) limiting the relief granted to that which is sought." (Doc. No. 32, Resp. to Defs.' Mot. to Dismiss 17.) Plaintiff does not explain how this would in fact lessen the prejudice to the EST or the United States. Moreover, as the EST points out, the NAT effectively concedes the effect of a judgment in the case when it argues that the EST can in the future be estopped by a judgment rendered here. (Doc. No. 115, NAT 19(a)(2) Br. 16.)

### C. 19(b)(3): Whether a judgment rendered in the absence of the EST and the United States would be adequate

■ In arguing the adequacy of a judgment absent the EST or the United States, Plaintiff makes the cursory statement that, "[a]n order from the U.S. District Court of [sic] the District of Wyoming should be adequate to stop the Defendants from illegally taxing NAT members." (Doc. No. 32, Resp. to Defs.' Mot. to Dismiss 17–18.) This may be so. However, Plaintiff fails to consider whether the judgment would be adequate as to all other parties in the case. Adequacy refers to more than just the satisfaction of Plaintiff's claims and includes the "public stake in settling disputes by wholes, whenever possible." *Pimentel,* 128 S.Ct. at 2193 (quoting *Provident,* 390 U.S. at 111, 88 S.Ct. 733); *Davis ex rel. Davis,* 343 F.3d at 1293 (explaining that 19(b)(3) is intended to address the adequacy of the dispute's resolution). As discussed above, the essence of this case is whether the State's assertion of jurisdiction is proper. The State and County Defendants reasonably voice concerns here as to the potential for piecemeal litigation were this case to go forward without the EST or the United

States, especially as the absent parties are not bound by the disposition of this case. Inconsistent judgments are possible. Proceeding without the EST or the United States would not wholly settle the underlying dispute.

### D. 19(b)(4): Whether Plaintiff has an adequate remedy if this action is dismissed for nonjoinder

■ The parties dispute whether there is another forum available to Plaintiff if this case is dismissed. The EST points out that a proceeding before the Environmental Protection Agency is presently under way in which the same boundary question will necessarily be decided in furtherance of the tribes' achieving Treatment as a State ("TAS") status under the Clean Air Act. (Doc. No. 114, EST Supplemental Br. 10.) However, Plaintiff argues that the proposed administrative forum suffers from problems absent in a court setting. (Doc. No. 120, NAT Reply to 19(a)(2) Brs. 12–14.) Specifically, Plaintiff asserts that the EPA does not have the power to afford the relief from unlawful taxation that Plaintiff seeks and notes that the TAS review is subject to political influence and interference.

The Court need not decide whether the EPA proceeding is an adequate alternative forum for Plaintiff's claims. In the context of tribal sovereignty, the Tenth Circuit has held that "the plaintiff's inability to obtain relief in an alternative forum is not as weighty a factor when the source of that inability is a public policy that immunizes the absent person from suit." *Davis ex rel. Davis*, 343 F.3d at 1293–94. When immunity deprives a plaintiff of a forum, this factor loses influence in the analysis. The Tenth Circuit quoted a D.C. Circuit passage on this issue with approval:

Although we are sensitive to the problem of dismissing an action where there is no alternative forum, we think the result is less troublesome in this case than in some others. . . . This is not a case where some procedural defect such as venue precludes litigation of the case. Rather the dismissal turns on the fact that society has consciously opted to shield Indian tribes from suit without congressional or tribal consent.

*Id.* (quoting *Wichita*, 788 F.2d at 777). Although these cases were decided in the context of tribal sovereignty, this principle applies with at least equal force in the context of the sovereignty of the United States.

Moreover, regardless of which government is asserting immunity, this final factor militating against dismissal can be outweighed by the weight of the first three factors in favor of dismissal. "Rule 19(b) does not state what weight is to be given each factor, and thus we must determine the importance of each factor on the facts of each particular case and in light of equitable considerations." *Navajo Tribe*, 809 F.2d at 1473. Availability of an alternative remedy is not a threshold question to be decided to the exclusion of all others; rather, it is one of four non-exclusive factors, to be considered as the rest are. Here, the Court finds that, in this context where sovereign immunity prevents joinder and where the first three factors favor dismissal, this final factor of an alternative forum is outweighed, despite the prejudice it may work on Plaintiff.

### E. Other cases cited by Plaintiff in support of proceeding without the EST and the United States

The findings of the Court here do not contradict the authorities Plaintiff references in support of going forward with the case without the EST or the United States.

### 1. Indispensability of tribes

On the original motions to dismiss, in arguing that the EST is not indispensable, Plaintiff argued that the relief that it seeks need not touch EST's sovereign interests, citing for support *Sac and Fox*, 240 F.3d 1250; *Yellowstone County v. Pease*, 96 F.3d 1169 (9th Cir.1996); *Oneida Indian Nation of New York v. City of Sherrill*, 337 F.3d 139 (2d Cir.2003); *Marion County Landfill, Inc. v. Bd. of County Comm'rs*, 211 F.R.D. 634 (D.Kan.2002); and *Cassidy v. United States*, 875 F.Supp. 1438 (D.Wash.1994). However, in each of these cases, the case-specific circumstances are readily distinguished from the circumstance here.

In four of these cases, *Sac and Fox*, *Yellowstone*, *Marion*, and *Cassidy*, the absent tribes were deemed not necessary under Rule 19(b), necessitating a finding that they were not indispensable. Where a court finds a party not necessary under Rule 19(a), the party cannot be indispensable under Rule 19(b). *Cassidy*, 875 F.Supp. at 1445–46. That aside, the facts in each of those cases are readily distinguished from the facts here. *See Yellowstone*, 96 F.3d at 1172 (holding that neither the tribe or its tribal court was necessary to the determination of the tribal court's jurisdiction given that the district court's judgment would be binding on the absent party and they did not have a legally protected interest at issue, noting that the tribe was not a party to a relevant agreement or treaty with any party to the suit); *Cassidy*, 875 F.Supp. at 1443–45 (holding the absent tribes not necessary for adjudication of the Agreement to which they were parties because their interests aligned with those of the United States the United States' representation would not compromise any obligation it may have to the plaintiffs or other Indian tribes); *Sac and Fox*, 240 F.3d at 1259–60 (although alternatively finding lack of indispensability, the court first held the absent tribe not necessary given the identity of interests between it and the defendant Secretary of Interior; the challenged actions were those of the Secretary, allowing for adequate judgment; and the absence of an alternative forum); *Marion*, 211 F.R.D. at 638 (holding the State of Kansas not necessary based on the terms of the settlement agreement at issue before going on to find in the alternative that it was not indispensable). The final case cited, *Oneida*, is similarly distinguishable from the case at hand. There, unlike here, the tribes alleged to be necessary and indispensable denied this allegation and insisted that their interests were aligned and protected by the tribe already in the action. *Oneida*, 337 F.3d at 170, *rev'd on other grounds*, 544 U.S. 197, 125 S.Ct. 1478, 161 L.Ed.2d 386 (2005). In contrast to these cases, here, there is no identity of interest for the EST and the EST does have a legally protected interest at issue.

Plaintiff unsuccessfully attempts to distinguish cases cited by State and County Defendants on the question of EST's indispensability. In each of those cases, the courts found the respective absent tribes to be indispensable on the underlying facts and posture of the case. *See McClendon v. United States*, 885 F.2d 627, 633 (9th Cir.1989) (finding that the absent tribe was indispensable as it was party to the lease agreement at issue); *Kescoli v. Babbitt*, 101 F.3d 1304, 1311 (9th Cir.1996) (finding that absent tribes were indispensable due to their need to protect their sovereignty and due to the effect judgment would have on their interests in the challenged lease and settlement agreements); *Citizen Potawatomi Nation v. Norton*, 248 F.3d 993 (10th Cir.2001) (finding that judgment may alter future funding for the absent tribes, and despite lack of alternative forum for the plaintiff tribe, case could not proceed

due to unmitigable potential prejudice to absent tribes); *Dawavendewa*, 276 F.3d 1150 (finding tribe indispensable as its economic interest in the lease with the defendant employer would be affected by a judgment invalidating the Navajo-preference hiring policy and no partial relief or other mitigating relief was available). Those cases do not suggest that the EST is not indispensable in this case. Moreover, they can be seen as supporting a finding of indispensability here. Underpinning each is a contractual interest held by the absent tribe. Similarly, here, the EST is a party to the 1904 Agreement that is directly implicated by Plaintiff's claims for relief. *See Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) ("A treaty, including one between the United States and an Indian tribe, is essentially a contract between two sovereign nations.") (citing *Lone Wolf v. Hitchcock*, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903)).

### 2. Indispensability of the United States

Plaintiff cites to a host of cases in support of proceeding without the United States. In many cases involving treaties entered into by the United States, courts have found the United States' interests to be aligned with the tribes' interests as the United States was the putative fee owner of the trust lands at issue. *Choctaw and Chickasaw Nations v. Seitz*, 193 F.2d 456 (10th Cir.1951); *Idaho v. Andrus*, 720 F.2d 1461 (9th Cir.1983); *Puyallup Indian Tribe v. Port of Tacoma*, 717 F.2d 1251 (9th Cir.1983); *Narragansett Tribe of Indians v. S. Rhode Island Land Dev. Corp.*, 418 F.Supp. 798 (D.R.I.1976). *See Navajo Tribe*, 809 F.2d at 1474 (distinguishing these cases from the facts in *Navajo Tribe* on this ground). Plaintiff references other cases challenging state taxation of Indians

where the United States was not a party. *See Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995); *Oklahoma Tax Comm'n v. Sac and Fox Nation*, 508 U.S. 114, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993); *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *Osage Nation v. State of Oklahoma ex rel. Tax Comm'n*, 260 Fed.Appx. 13 (10th Cir.2007).

However, the Court finds that the circumstances of this case require dismissal in the absence of the United States. *Navajo Tribe* is instructive as the facts of that case closely align to those here. There, the court found the United States indispensable based on a review of the four Rule 19(b) factors. First, the United States would be prejudiced by a judgment in its absence. *Id.* at 1472. The court held that the tribes' claims challenged transactions entered into by the United States relating to the land in question and questioned the validity of the United States' title to those lands. *Id.* at 1471. Second, the question of title must be decided entirely or not at all, precluding any possibility that the prejudice could be lessened. *Id.* at 1472. Third, a judgment in the absence of the United States would not be adequate given the size of the land holdings at issue. *Id.* at 1473. The Court went on to hold that these factors outweigh the finding under the fourth factor that the plaintiff tribe had no adequate remedy on dismissal. The Court further noted that the United States held a competing interest to that of the tribe, rendering inapposite other cases in which the United States was not indispensable due to mutuality of interests. *Id.* at 1473.

The United States is similarly indispensable. While the prejudice to the United States in *Navajo Tribe* was premised on a competing claim of title, the prejudice here

is no less significant. Judgment in favor of Plaintiff that the 1905 Act area is still a part of the Reservation implicates more than just the United States' interests arising out of the specific terms of the 1904 Agreement. As a general matter, the United States assumes significant administrative, civil, and criminal jurisdiction over Indian country. Not unlike in *Navajo Tribe*, the 1905 Act area encompasses a vast area of nearly 1.5 million acres,[17] and the State has long assumed jurisdiction over the area. To conclude that this area is in fact Indian country would effect a dramatic shift in jurisdiction. A judgment in the absence of the United States undoubtedly would prejudice its jurisdictional interests. As in *Navajo Tribe*, there is no way to mitigate this prejudice. It would also leave more questions unanswered than answered, rendering any judgment inadequate. Although the United States in *Navajo Tribe* more clearly had a competing interest to that of the tribe than is the case here, the Court cannot presume to know the United States' position on the merits of this action, despite Plaintiff's assertion that the United States' position in *Big Horn I* aligns with Plaintiff's present position. The Court cannot find that in equity and good conscience the case may proceed without the United States.

### 3. Diminishment cases decided without the United States as a party.

Plaintiff notes that in prior diminishment cases, a prerequisite for decision has not been the participation of either the United States or the affected tribe. Plaintiff references seven oft-cited cases on diminishment: *Seymour v. Superintendent of Wash. State Penitentiary*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962); *Mattz*

*v. Arnett*, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973); *DeCoteau v. Dist. County Court for the Tenth Judicial Dist.*, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975); *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); *Solem v. Bartlett*, 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984); *Hagen v. Utah*, 510 U.S. 399, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994); *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998). Based on this body of law, Plaintiff suggests that the equities balanced under Rule 19(b) weigh strongly against dismissal. Disputing this suggestion, the State contends that several of these cases are distinguishable in that they were not original proceedings to determine disestablishment or diminishment.

*Seymour, Solem,* and *DeCoteau* were all habeas cases in which the state's jurisdiction over the individual Indian petitioners was challenged on the basis that the underlying acts and crimes occurred on a reservation or in Indian country. *Hagen* involved direct review of a state court's jurisdiction over an Indian's crime that allegedly occurred in Indian country. *Mattz* involved a state civil forfeiture action in which the intervenor Indian alleged the seizure of his property was improper as it occurred in Indian country where the state laws did not apply. In *Mattz, DeCoteau,* and *Hagen*, the United States participated as *amicus curiae* by special leave of the Supreme Court and supported the views of the individual Indian petitioners that diminishment had not occurred. In *Solem*, both the United States and the affected tribe filed briefs as *amici curiae* urging affirmance of the decision that the reservation had not been diminished.

(Doc. No. 78, NAT Mot. for J. 18.)

---

**17.** Plaintiff states that 1,438,633.66 acres were opened to settlement by the 1905 Act.

In the final two cases, *Rosebud* and *Yankton*, the tribes themselves directly raised the question of diminishment. In *Rosebud*, the tribe sued for a declaratory judgment as to the effect of three Acts of Congress on the boundaries of their reservation. Similarly, *Yankton* was a declaratory judgment action brought by the tribe to enforce its right to regulate a landfill allegedly within the exterior boundaries of the reservation, thus requiring a diminishment analysis. In both cases, the *United States* appeared as *amicus curae* for the respective tribes.

Thus, in all but the earliest of this line of cases, *Seymour*, the United States appeared as *amicus curae*. In just one of the cases brought by individual petitioners, the tribe appeared as *amicus curae*.

Plaintiff raises a difficult question. It is true that in each of these cases, the Supreme Court decided the question of whether a reservation had been diminished or disestablished by an act of congress. In none of these cases is there a full complement of the affected tribe and the United States as parties. However, in all but the earliest, the United States appeared as *amicus* on behalf of the individual Indian or Indian tribe, ostensibly acting in its trust capacity.

Perhaps the suggestion, then, is that the EST and the United States may appear as *amici* as this matter progresses, as the United States did in *Rosebud* and *Yankton*. However, the Court finds that appearance as *amicus* in this case is an insufficient substitute for participation as a party. Ability to appear in an amicus status does not lessen the prejudice that would exist in this case. *See Makah*, 910 F.2d at 560. "If the opportunity to brief an issue as a non-party were enough to eliminate prejudice, non-joinder would never be a problem since the court could always allow the non-joinable party to file amicus briefs. Being party to a suit carries with it significant advantages beyond the amicus' opportunities, not the least of which is the ability to appeal an adverse judgment." *Wichita*, 788 F.2d at 775 (citing cases). In the circumstances of this case, where the real and direct issue before the court is the jurisdictional status of the 1905 Act area, the EST and the United States must be parties before the Court can address the question without concern for prejudice to their sovereign interests.

## CONCLUSION

No party presently before this Court disagrees that the issues presented in this case are of vital import and demand resolution. Plaintiff's claims raise issues that touch indelibly upon its sovereignty. However, resolution of this issue leaves the same mark upon the sovereignty of the EST. Not dissimilarly, significant interests of the United States are affected by this issue. The sovereignty of each nation demands equal respect, yet two of the affected sovereigns resist joinder. It is for this reason the Court joined the EST and the United States as third-party defendants. Every opportunity was given to flesh out the availability for this suit to go forward. However, neither the EST nor the United States is willing to waive immunity and the Court finds that this case cannot proceed without them. Therefore, the Court is compelled to dismiss this matter for want of parties who may not be joined.

NOW THEREFORE, IT IS HEREBY ORDERED:

1. That the Eastern Shoshone Tribe's Motion to Dismiss it as a party (Doc. No. 90) is GRANTED;

2. That the United States' Motion to be Dismissed as a Third–Party Defendant (Doc. No. 93) is GRANTED;

3. That State Defendants' Second Motion to Dismiss (Doc. No. 96) is GRANTED;

4. That Defendant Harnsberger's Renewal of Motion to Dismiss (Doc. No. 100) is GRANTED;

5. That all outstanding motions not addressed in this order are DENIED AS MOOT.